HEARD APRIL TERM, 1878.

## HAND *vs.* RAILROAD COMPANY.

In an action to wind up the affairs of an insolvent railroad corporation, in which different classes of creditors, embracing, it may be, many individuals, have been made parties by publication, an order directing the Receiver to change the location of a part of the road and build a bridge with the income of the corporation should not be made upon the recommendation of a Receiver and the report of an engineer, but only upon the report of the Master showing that necessity for the change exists.

### BEFORE REED, J., AT CHARLESTON, JULY, 1877.

This case will be found reported in 5 S. C., 182; 6 S. C., 307, and 8 S. C., 207, and by reference to those reports the nature and object of the action will be understood.

It now comes before the Court on the report of the Receiver, C. T. Mitchell, Esq., and the Engineer, C. S. Gadsden, Esq.

The report of the Receiver is as follows:

I respectfully submit for the consideration of the Court a report of C. S. Gadsden, Esq., the Engineer and Superintendent of the Savannah and Charleston Railroad, showing the necessity for an immediate change of the track of the road so as to form a connection with the Northeastern Railroad and thereby enter the city, and recommending the building of a new track from near the John's Island Station to the Ashley River, at Bee's Ferry, and crossing that river by a bridge at that point.

I entirely concur in the views of Mr. Gadsden and recommend their adoption by the Court.

I have caused the solicitors representing the various liens upon the road to be consulted, and am informed that they concur in the opinion that there is a great and immediate necessity for the change.

From the proposed bridge over the Ashley River the Ashley River Railroad Company is ready to construct a road to the Northeastern Railroad, and these two corporations offer to make a fair and equitable arrangement for the use of their tracks into the city, and thus complete a continuous railroad connection and route from New York to Florida by way of Charleston. Unless this is done it seems inevitable that the through mail system will be taken away from us and a general decadence rapidly go on. All that is necessary, I believe, to effect a complete connection, and to give to

the Savannah and Charleston Railroad the long-deferred benefit of entering the city by rail in time for the opening of the Autumn business, is the authority of the Court to construct the work, the cost to be charged upon and paid from the income of the road. And I respectfully recommend that this be done.

The report of the Engineer is as follows:

*Mr.* CHARLES T. MITCHELL,
                    *Receiver Savannah and Charleston Railroad.*

SIR: In reply to your inquiry as to the proposed change of route of the Savannah and Charleston Railroad from a point near the John's Island Ferry Station (nine miles from the city) to the crossing in the Ashley River at or near Bee's Ferry, and the construction of a bridge at that point, I respectfully report the experiences at the present terminus in "St. Andrew's" and the substantial reasons for a change of route.

The early history of the road shows that the first choice of the engineer was a location practically that now contemplated, and the selection of the present site opposite the city, on the West bank of the Ashley River, was made only after much discussion and serious opposition.

It was soon discovered that the choice of the St. Andrew's terminus in preference to an entrance into the city *via* the Bee's Ferry route was a grave mistake—a mistake which, more than any other cause, has involved the enterprise in financial ruin.

Experience has shown that the water carriage necessary to the transfer across the Ashley River is very expensive and unsatisfactory. The delays, inconvenience and exposure incident to passenger traffic at that point prejudice the through travel against the route and cause the travelers, especially invalids and families, to seek more agreeable lines of communication. The repeated handling of freight, inseparable from the system, is a source of much complaint, and the expense considerable. The handling and receipt of both passengers and freight on the Western side of the city involves a transfer across the entire width of Charleston, which is found practically to equal an additional rail transportation of twenty-five miles on passenger and one hundred miles on certain classes of freight traffic.

The superior advantages of a location in the city induced an examination into the practicability of a bridge across the Ashley

River at the West end of Calhoun street. The proximity of the present terminus to the city seemed to point to this means of escape from the errors committed by the early management, and this project has been thoroughly canvassed.

The very great cost of a suitable structure, the exposed position of a bridge spanning the river at this locality and the difficulty of traversing with trains the entire width of the city, even were the bridge built, have prevented any serious attempt in this direction.

The history of the temporary bridge built during the war seemed to impress the more forcibly the folly of using other than permanent foundations.

The many estimates made from time to time by the bridge building firms of the country for a suitable bridge range from a quarter to a half million dollars.

Thus the experience of the seventeen years of the life of this enterprise, while proving the folly of the choice of the St. Andrew's terminus and the necessity of a depot in the city of Charleston, proved also that a bridge at or near the present terminus was an undertaking beyond the possibilities of the present and unlikely to secure the advantages sought. The judgment of those who in the beginning pointed out the route by Bee's Ferry and an entrance into the city by that means has been endorsed by all those who have participated in the management of this property as well as by the test of time.

The construction of nine and one-half (9½) miles of road between the John's Island Ferry Station, on the Savannah and Charleston Railroad, to the six-mile post on the road North of the city of Charleston secures a connection with the system of railroads North and West and an entrance into the city at a comparatively moderate outlay.

The Ashley River at Bee's Ferry is but four hundred and fifty (450) feet wide at low water, and a timber bridge, readily and cheaply constructed, will be all that is necessary.

In these days of close connections, rapid mail transportations and low freight charges, the advantages of this route must be evident on the most casual examination.

The continuity of rail for the interchange of passenger and freight traffic is a necessity of the times. The Charleston break of continuity is the only one now existing in the Atlantic Coast Line system from New York to Florida.

Columbia, April, 1878.

A charter for an independent company proposing to build this connection was granted by the South Carolina Legislature, and this road would long since have been built but for the disturbed financial condition of the affairs of the Savannah and Charleston Railroad Company.

The object of the present move is to transfer the nine mile section from John's Island Ferry Station of the St. Andrew's terminus to the new route. In other words, to build along the Bee's Ferry route, to and across the Ashley River, under the charter of the Savannah and Charleston Railroad, using, as far as they will go, the proceeds of the sale of the old materials abandoned on the old road. By this scheme, upon the completion of the Bee's Ferry line, the length of the road will be 97¼ miles, in place of 101, as formerly, or 92 miles should this branch line be built under the independent charter.

The cost of construction from John's Island Ferry Station to the North bank of the Ashley River will be as follows:

\* \* \* \* \* \* \* \* \* \* \* \*

[The aggregate amount of the estimate annexed to the above report was $32,846.20.]

His Honor made the following order:

On hearing the report of Charles T. Mitchell, Receiver, covering report to him of C. S. Gadsden, Engineer and Superintendent, and it appearing that an early connection enabling the Savannah and Charleston Railroad to deliver and receive its freight and passengers within the city, and to continue the transportation of the mails as at present, is essential to the value of the property and in aid of the security of the lien holders, it is, therefore, on motion of Mr. Campbell, and with the consent of other solicitors in the several causes, ordered as follows:

1. That the Receiver, Charles T. Mitchell, be authorized to make suitable, fair and satisfactory agreements with the Ashley River and Northeastern Railroad Companies, or any other responsible corporation or parties, by which the trains of the Savannah and Charleston Railroad Company may enter the city to receive and discharge freight and passengers and closely connect with the great mail route to and from Washington and New York.

2. That thereupon the said railroad shall be, and hereby is, authorized to construct, or cause to be constructed, a new track from the John's Island Station to Bee's Ferry, and to build a suitable bridge over the Ashley River at that point, as recommended in and by the report of Mr. Gadsden, Engineer and Superintendent, and at a cost not exceeding the estimate appended thereto.

3. ·That the cost of said track and bridge be paid out of the surplus income of the road, after paying current expenses, repairs and other charges already upon it, and the same, when built and paid for at the cost of construction, shall be subject to and covered by the present existing liens, according to their legal priority, as shall any agreement made with the Ashley River Company or persons for the use of their property. And until the work hereby ordered shall be paid for, in the manner provided aforesaid, they shall be, and stand as and for, a security for such persons as shall furnish material, or construct them, or shall advance or loan money to pay for such material and construction.

4. That the Receiver have leave to apply for any further orders necessary at any time to enable him to carry into full effect the purposes of this order.

To the above order was appended the written consent of a number of firms of solicitors representing different parties to the action.

James Conner, a holder of six per cent. bonds of the Charleston and Savannah Railroad Company guaranteed by the State of South Carolina and secured by the statutory mortgage to the State, who became a party to these proceedings and proved his claim under the order of the said Court, dated                    , appealed, on behalf of himself and such other lien creditors as will unite in prosecuting this appeal, from the order of His Honor Judge Reed made in the above entitled cause on the 11th day of July, 1877, on the following grounds:

1. That the order was granted on the application of the Receiver alone, and upon *ex parte* statements furnished by the employees of the Receiver.

2. That the Court had no jurisdiction or authority to expend the income or assets of the corporation in the construction of a new road and bridge, and could grant no such authority to the Receiver, and that the order of Court granting such authority is illegal and void.

3. That the surplus income of the corporation can be applied only to the payment of the lien creditors of the corporation, and the application of it to any other purpose is illegal and void.

4. That the Court had no authority to change the route of the Savannah and Charleston Railroad Company and to construct a new one. If such power still exists, it is vested by Act of the Legislature in the stockholders or Directors of the corporation and not in the Court.

5. That the construction of the new route destroys the value of the old, and to that extent impairs the security created for the protection of the six per cent. bonds of the Charleston and Savannah Railroad Company.

6. That whether the proposed change of route will impair the value of the property in the custody of the Court or enure to the benefit of the lien creditors are questions which the Court had no jurisdiction over and could neither hear nor decide. That the only power or duty of the Court is to administer the property until it can be sold for the payment of the lien, and that, in assuming to decide upon the propriety of the proposed change and authorizing it, the Court exceeded its powers in the premises and its order is illegal and void.

7. That the order appropriates the surplus income to the construction of the new track and bridge and gives to the parties a lien over said track or bridge.

*Conner*, for appellant.

*Memminger, Campbell*, contra.

November 25, 1878. The opinion of the Court was delivered by

WILLARD, C. J. The Savannah and Charleston Railroad Company has been sued by D. Hand, a bond creditor, upon the allegation of insolvency, with the usual demand for a Receiver and for the collection and distribution of its assets in payment of its debts. C. T. Mitchell was thereupon appointed such Receiver and assumed the management and control of the franchises and property of the company under orders of the Circuit Court for the First Circuit. The road was, at the time of the commencement of this suit, operated as a passenger and freight road between the cities of Charleston and Savannah. The Receiver continued to operate the

road. At the time the Receivership was created the Charleston terminus was separated from the terminus of the Northeastern Railroad, with which road the company's traffic to the Northward was principally connected. The Receiver applied to the Court for authority to change a portion of the line of the road, commencing Southerly of the existing terminus, by building from that point a new line to the Ashley River, North of the city of Charleston, and thence, over a bridge to be constructed for that purpose, across the Ashley River, alleging that from that point to the Northeastern Railroad a company duly authorized for that purpose was prepared to extend a line of road and that suitable arrangements for transmitting trains over such road and connecting with the Northeastern Railroad could be made with both companies. A stipulation, purporting to be signed by the solicitors of all the parties in interest, was presented to the Circuit Court, consenting to an order for that purpose. It appears, however, that the appellant, a party in interest, did not consent, but opposed the granting of such order on various grounds. Upon such application the order was made from which the present appeal has been taken. The propriety of this order can only be considered as it regards parties who did not assent to it. Under this order the work has been completed, and it is understood that parties who have made advances towards the construction, claim, under the terms of the order, a first lien on that part of the line thus constructed, including the bridge across the Ashley River. It appears, also, that a portion of the original line, as it went into the hands of the Receiver, has been abandoned and is worthless in consequence of the opening of the new line.

Before considering the questions presented by the appeal, we cannot pass without notice the evidence furnished by this case of the disregard of the customary precautions proper to prevent injustice where Courts are dealing with the interests of parties represented before the Court as a class or classes. In such cases there is ordinarily no such strict representation that the Court can safely act on stipulations purporting to be with the consent of parties without inquiry, and therefore the practice prevails, and should be adhered to, of referring matters of that description to a Master or Referee for a hearing and report on such matters as may be deemed requisite to inform the Court as to the propriety of the order. Had that course been pursued in the present case, it is probable that we should be able to form a better judgment of the nature and effect of the

order in question than can possibly be formed from the meager statement of the facts and proceedings in the case brought before us in this appeal. It cannot be doubted that the Court might, under proper circumstances, order a change to be made in the state of the property in its hands for distribution among creditors with a view to increase the value of the fund, but it is clear that the pursuit of speculative advantages would not present a proper case for its exercise. To preserve the property from all causes tending to its depreciation, to render it reasonably productive during the period it remains in the hands of the Court, are objects proper for the attention of the Court, and its hands should not be too rigidly tied in the pursuit of these objects. On the other hand, for the Court to undertake to weigh the merits of projected improvements, and to assume in behalf of the parties in interest that class of experimental risks that appertain to the development of material industries, is both inconsistent with the nature of a Court and the objects with which it holds assets for the satisfaction of creditors. A Court is compelled to inform itself through allegations and proofs—a channel unsuitable for drawing correct judgments as to the relative advantages of projected lines of railroad. Sometimes it is true that Courts are called upon to devise schemes that involve more or less of the exercise of business prudence and foresight, but such cases are of rare occurrence, and the necessity of the case is the ground upon which the Court departs from its customary functions. On the other hand, the sole ground for holding property in cases of this class is the preservation of the property and its application to the demands of creditors. It should be the interest of all parties that distribution should be speedily made; but if the Court can assume to carry out projects that look to the ultimate successful establishment of a railroad, it may become the interests of some of the parties to work out their plans through the instrumentality of the Court, firmly holding the property against the immediate demands of creditors, while if the hands of the Court were removed such projects would be likely to be interrupted through causes arising from its indebtedness. Such temptations for indefinitely continuing the control of the Courts over insolvent institutions should be removed as far as possible, not only for the sake of preserving purity in the administration of justice, but for the sake of the parties entitled to distribution,—as experience shows that funds in the hands of a Court for distribution cannot by any act be made to grow while in that custody.

We are led by these considerations to conclude that before the order in question was made, as affecting the interests of parties not assenting to it, it should have been shown that some necessity existed for the change projected in the location of the line of the railroad, such necessity having relation to the production of the property or business of the railroad. No such case is presented. The advantages presented to the Court as likely to arise from the change are of such a nature as to call for the exercise of business sagacity and foresight, rather than prudence, for the formation of a judgment in regard to them. This, in our judgment, is reason sufficient for the refusal of the order when objected to. The order, as it regards the appellant, must be set aside.

*McIver,* A. J., and *Haskell,* A. J., concurred.